1, 2, 9, 8, Hector Montanez v. Lisa A. Mitchell et al. Also, with regard to the evidentiary hearing, I did want to point out that with respect to the district court's decision on that, it was not possible for Mr. Montanez to allege, because he had no factual basis to allege, that the government intentionally withheld the tape. These tape recordings, particularly in the year 2007, are used to take the 911 call onto a little cassette tape. These things are very frequently not available because somebody made a mistake. They didn't record it. Typically, after a period of time, the master tape will get erased. Sometimes these little cassettes are lost. Sometimes they're damaged. So you really cannot accuse the poor prosecutor of having done something wrong if you don't know why he did not turn over this tape. Does it make any difference? Yes. The state says, the commonwealth says, that you had, before trial, the material information from the 911 call because the gist of it, at least as far as the description, which is your main point, was repeated in the police report which was given to you before trial. It is true that the police wrote down what they recalled, the fellow who was burglarized. You've now seen or heard the 911 call. Is that different from the police's description of what they withheld? I think it's more specific. It is a little bit different. It's more specific and more to the point. If the fellow who's testifying, your sole eyewitness testifying, and this was a fairly general description so these small things mattered. When he changes his recollection to conform to the way my client looked during a show up after the crime, the differences between the 911 call description and the description that he's giving at trial make a big difference. If you were able to cross him, it would have shown that his recollection was imperfect. As it was, because he could not be crossed with the correct information, what he actually did say to the 911 operator, he came across as being very certain of his identification. And this was just a terrible thing to happen in a case where you only have one identification witness and identification is the issue at trial. So this was extremely important that counsel be able to cross the eyewitness with what he actually said to the 911 operator. So the failure here to allow cross in this case was just extremely prejudicial regardless of which of the standards the court has. Excuse me. The failure to allow cross? No one precluded the petitioner from cross-examining. I misspoke. The inability, I should have said, of counsel to cross-examine the eyewitness with what he actually said which appeared on the 911 tape. I thought the petitioner was cross-examined on the discrepancy between what the police officer said he had said and what he said on the witness stand. I think that's accurate, yes. And what the police officer said he had said was essentially what's on the 911 tape. So that's where I'm just looking as to why any failure to produce this tape can be said to be substantially injurious. Well, first of all, there were differences. The police did not recite exactly what the eyewitness said to the 911 operator. But secondly, and very importantly, where there's only one eyewitness in the cases about identification, the witness who is testifying to the jury is sure of himself. He thinks he remembers what the burglar looked like. Had he been crossed with what he actually said at the time, he presumably would have been somewhat shaken in his certainness which would have had an impact on the jury. Well, why wasn't he shaken by examination based upon the disclosure in the police report which gave you the basic information? Well, he remained very confident. But what reason have we to believe that he would have been any different in his confidence? I see. If you or trial counsel or whoever it was had had the tape as opposed to the police report which revealed the discrepancy? Well, first of all, the police report doesn't reveal all the discrepancies. But you keep saying, well, there were some differences. It doesn't reveal all the discrepancies. Is there anything of any significance? Can you put your finger on something? If I had known that, his examination would have been different. He would have been likely shaken in his confidence. Well, just as one example, for instance, when the eyewitness testified that he didn't say that the burglar had a mustache, if you could cross him on the fact that he did in fact say that. So why couldn't you cross him? It was in the police report, wasn't it? I think that in the police report they included facial hair. There was a lot of discussion about whether it was a mustache or facial hair. And the cross examination using the police report did not seem to shake the eyewitness's confidence that he was accurately remembering the appearance of the burglar. Did the police report say the first time on the phone he said a mustache? You know, I would have to check that to be absolutely sure. Well, that's the crux of your argument, it seems to me. I mean, that's the point that Judge Selye's question goes to. That's the important point. And if you knew that, I don't see what argument you've got. I haven't heard a basis for an argument yet to say that there probably would have been the possibility even of a significant difference if you would have the tape rather than the police report. Well, there are many things that the eyewitness said to the 911 operator that he didn't recall. And one of them had to do with a coat. You know, he had said to the 911 operator that he didn't recall what kind of a coat the person was wearing. Then later on it turns out that he thought he recalled specific things about the coat. What had happened to his recollection was that after he went to the show up, believing that he did identify my client at the show up, believing that he had accurately identified the burglar, when he got to trial and testified at trial, his testimony of the appearance of the burglar conformed to my client's testimony at the show up and was different in some respects from what he had said to the 911 operator. And without being able to cross, using what the witness had actually said to the 911 operator, defense counsel was not able to convince him that perhaps his recollection of the burglar's appearance now, as he's sitting in the witness stand, is inaccurate in any respect. Counsel, thank you. Your time is up. We'll take the rest of your case on the brief. Excuse me. Counsel, these communications that you did not get post-trial, do they, there's some reference in the briefing to some radio traffic suggesting the presence of other individuals in the area? Yes. Again, these communications that you did not get until post-trial, is that the first time you learned about the presence of other individuals in the area? It is, Your Honor. Trial counsel did not know that. All right. Thank you. Thank you. Thank you. Good morning. May it please the Court. My name is Thomas Boshin. I represent the respondents Lisa Mitchell and Martha Coakley in this matter. I'll begin with the Brady claim since that's where the Court just left off. The only differences that I can discern between the 911 recording and the police officer's report or the police officer's testimony about the initial broadcast are the, is the detail about the mustache, and also in the 911 recording, Mr. Nichols said that it was, excuse me, I apologize. Mr. Nichols said that the intruder was short, whereas the police officer said of medium height. But those are the only two differences. And I point out that at page 520 of the supplemental answer, counsel did specifically ask Mr. Nichols, did he have a mustache? I'm paraphrasing. So even that question was posed to Mr. Nichols. Mr. Nichols, in a two-day trial, had 63 pages of cross-examination. And I think if the Court reads through the whole cross-examination, it will see that he wasn't sort of left without challenge on his remembering, the details that he could remember and the appearance of the intruder that had been inside of his home. And, excuse me, I apologize. With respect to the mustache, in addition that the police officers testified about the existence of the mustache at the trial and the petitioner, as the Court alluded to, had the report before trial. So this wasn't a case of a surprise detail. It was a detail that was known at the time. And Nichols' testimony about Mr. Montanez being the intruder was corroborated in certain respects. Mr. Montanez was apprehended a short distance. The distance was actually five to six blocks from Mr. Nichols' home. And a short time after the break-in, according to the police, the dispatch that came through after Mr. Nichols reported it was at 10.52 p.m. And Charette testified that he detained Mr. Montanez around 11 o'clock. So it was a very brief period of time when the police found him in that area. Also, again, he was carrying tools commonly used by burglars. And Charette said he was the only person in the area who matched the description, as well as the fact that he engaged in that sort of furtive behavior, which the jury could have taken to demonstrate a consciousness of guilt. What were these tools? The top of a screwdriver and also wire cutters were found in his back right. It was a back pocket. I believe back right. It might have been back left. In light of these circumstances, there's no reasonable probability of a different result if the tape had been disclosed. With respect to the two individuals that Judge Lopez just asked about, the 911 tape reveals that the police officer very quickly, after he says that he's going to speak with them, says that they checked out. So there's no non-speculative basis to think that these two individuals had anything to do with this particular matter or would have led to any evidence or witnesses that may have borne on any issue that was relevant. The only other two individuals that were in the area were the two that Detective Roy saw as he was on his way to Nichols' home. And, of course, Detective Roy testified about those two individuals at trials. The jury was aware about them, and defense counsel actually argued in closing that Mr. Montanez was not one of those two individuals that Officer Roy had seen. In terms of the first claim, the cross-examination claim, I'd just like to make one point, and that is that the state appeals court's decision is entitled to deference. The petitioner presented a Sixth Amendment claim squarely, and the state appeals court refused to order relief, noting that the detail ñ excuse me, this doesn't usually happen to me, I apologize. The state appeals court noted that the evidence at issue had already been elicited through other witnesses, the evidence about the gun permit, Mr. Nichols not having a gun permit, and because the evidence had been elicited through other witnesses, there was no prejudice, which is basically the same inquiry as the federal standard. So contrary to the district court, there's no need for the state appeals court to cite cases. This court and the Supreme Court have made that clear. And with respect to the application of an abuse of discretion standard, the SJC has applied that standard for close to 40 years now in examining confrontation clause claims. So that, too, is not a basis to conclude that the state appeals court did not decide the merits. Finally, with respect to the evidentiary hearing, I'd just like to point out that the Harbison decision came up in a very different context. There, the habeas proceedings had already concluded. The habeas proceedings had already been through the Court of Appeals, and it was a motion ñ at issue was a motion to allow the federal defender who had represented the petitioner to continue to represent him in state clemency proceedings. And the court there concluded, and the government conceded, that a certificate of appealability was not necessary. But here what is being challenged is the final order denying the hearing on the merits. And courts of appeals, even after Harbison, when asked to issue certificates of appealability, have analyzed whether an entitlement to an evidentiary hearing should be among them. So Harbison hasn't changed how ñ Grant, I haven't found any from this court, but Harbison hasn't changed how the courts of appeals have approached that issue. And the approach is consistent with why the certificates of appealability were put into place in the first place, a screening mechanism to make sure that appellate panels, at this stage of review, after this many levels of review, did not have to deal with issues that did not warrant consideration by meeting a certain threshold level. Unless the court has other questions. Thank you very much, counsel. Thank you both.